IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SENG YANG, MAI TONG YANG, and YIA YANG, | ) ) ) | CIV F 06-458 AWI DLB |
| Plaintiffs, | ) ) | ORDER ON DEFENDANT'S MOTION FOR PARTIAL |
| v. | ) ) | SUMMARY JUDGMENT |
| PEOPLES BENEFIT INSURANCE COMPANY, and DOES 1 through 50, inclusive, | ) ) ) ) | |
| Defendants. | ) ) | |

Seng Yang, Mai Yang, and Yia Yang (collectively "Plaintiffs") are named beneficiaries of a life insurance policy underwritten by Defendant Peoples Benefit Insurance Company ("Defendant" or "PBI") and purchased by Chue Lor ("Lor"), who was the wife of Seng Yang and mother of Mai and Yia Yang.  Lor was killed in an automobile accident.  PBI concluded that Lor had provided incorrect information on her application, rescinded the policy, returned the paid premiums, and refused to pay the proceeds of the policy.  Plaintiffs filed this suit in diversity and alleged claims against PBI for breach of contract and breach of the covenant of good faith and fair dealing.  During discovery, it was determined that Lor had not knowingly given false information and PBI paid Plaintiffs the policy benefits without prejudice to the lawsuit.  PBI now moves for partial summary judgment on Plaintiffs's bad faith claim and prayer for punitive damages.  For the reasons that follow, the motion will be denied.

# FACTUAL BACKGROUND

Lor applied for a $50,000 life insurance policy through PBI on April 28, 2002, when PBI's authorized sales agent, Mr. Lee Her ("Her"), came to Seng Yang's ("Seng") home to sell a life insurance policy on Lor's life.  <u>See</u> DUMF No. 1;[1] PUMF No. 6.[2]  During the meeting, Her spoke Hmong because Seng and Lor did not speak English.  PUMF No. 7.  Her asked questions and filled out the insurance application to be submitted to PBI.  PUMF No. 8.  Lor listed the Plaintiffs as the primary beneficiaries.  DUMF No. 2.  On the application, Lor indicated that her personal physician was Dr. John V. Dao and that she had last visited him on April 2, 2002,[3] for a "regular check-up for fever."  DUMF No. 3; PRDUMF No. 3.[4]  On the application, Lor responded "no" to question number 6, which read: "Within the past 10 years, has any proposed insured been treated or diagnosed by a health care professional as having any disease or disorder of the . . . Endocrine system, muscles or bone (such as thyroid, lupus, arthritis, or back problems)?"  DUMF No. 4; PUMF No. 9.  In response to question number 9, Lor acknowledged that she was taking medication, but when asked to list those medications, she responded that she was taking only Tylenol.  DUMF No. 5.  Seng and Lor told Her that Lor had not been treated for any serious injuries or medical problems because to their knowledge, Lor never had been.  PUMF No. 10.  Based on the representations in Lor's application, PBI issued Policy No. 012712608 ("the Policy") effective May 7, 2002.  DUMF No. 6.  Lor was killed in an automobile accident on April 22, 2004.  DUMF No. 7; PUMF No. 11.

Seng contacted PBI's authorized sales agent, Her, who agreed to take responsibility for filling out the necessary forms and submitting them to PBI.  PUMF No. 12.  On April 26, 2004,

---

[1]"DUMF" stands for "Defendant's Undisputed Material Fact."

[2]"PUMF" stands for "Plaintiffs's Undisputed Material Fact."

[3]Lor was seen at the Kings Winery Medical Clinic in early March 2002 with complaints of headaches and weak, tingling legs.  <u>See</u> PUMF No. 1.  Lor returned on April 2, 2002, with complaints of headaches, back pain, and tingling of the hands and fingers.  <u>See</u> PUMF No. 2.

[4]"PRDUMF" stands for "Plaintiffs's Response to Defendant's Undisputed Material Facts."

2

1  the claim was reported and PBI assigned the primary responsibility for the adjustment of the
2  claim to Senior Examiner Donna Bagge ("Bagge").  PUMF No. 13.  As part of the claim
3  documents, in response to the question, "On what date did deceased first complain of or give
4  other indications of last illness?", Seng responded, "Death Cause [sic] by Car Accident – No
5  Illness."  See Wilkins Declaration at 295; cf. PUMF No. 27 with DRPUMF No. 27.[5]  Upon
6  receipt of the file materials, Bagge readily concluded that Lor's death was not related in any way
7  to lupus.  PUMF No. 14.

8      Because Lor's death occurred within the Policy's two-year contestable period, PBI
9  conducted a standard contestable investigation, which included obtaining and reviewing Lor's
10 medical records and obtaining an underwriting review of the medical records that existed prior to
11 the date of the application.  DUMF No. 8.[6]  Investigations during the contestability period verify
12 or determine whether the representations made on the application are accurate.  See Bagge
13 Deposition at 56:15-22, 68:15-22.  The purpose of the investigation was to determine whether the
14 Policy would have been issued as applied for if Lor had fully disclosed her medical history on her
15 application.  DUMF No. 9.

16     During the course of the handling of the claim, Seng had his relatives and Her assist him
17 with presenting his claim because he did not speak or read English.  PUMF No. 28.  As a result
18 of Seng not speaking or reading English, Her prepared letters to PBI for Seng.  PUMF No. 29.
19 Seng undertook efforts to make it clear to PBI that he did not speak or read English.  PUMF No.
20 30.  Seng did not discuss the claim directly with PBI because of his inability to communicate in
21 English.  PUMF No. 31.

22     Shortly after it received Plaintiffs's claim for benefits, PBI requested records from Kings
23 Winery Medical Clinic ("the Clinic"), where Lor had been seen by Dr. Dao.  DUMF No. 10.  PBI

24 _____

25    [5]"DRUMF" refers to "Defendant's Response to Plaintiff's Undisputed Material Facts."

26    [6]Plaintiffs respond to this DUMF by more or less recapitulating their argument that PBI investigated this
   claim in bad faith and argue that PBI's standard practice in conducting investigations is one of bad faith.  See
27 PRDUMF No. 8.  This particular DUMF simply states that an  investigation was conducted, it does not deal with the
   adequacy of the investigation or whether the investigation was done in bad faith.  DUMF No. 8 is not disputed.

28                                                      3

did not receive the records for many months because, according to the Clinic, Seng refused to consent to the release of Lor's medical records.  DUMF No. 11.  In January 2005, PBI received the requested records, which contained entries from Dr. Dao and Dr. Charles Phillips, another doctor at the Clinic who had seen Lor.[7]  DUMF No. 12.  The medical records contain a March 8, 2002, entry that states "Imp.: Early lupus," and another entry on April 2, 2002, stating, "Early SLE."  DUMF No. 13.  Both entries were made in the portion of the medical records reserved for the physician's "assessment."  DUMF No. 14.  The records also reflected that Lor experienced many symptoms generally associated with lupus, including skin rashes, arthritis, anemia, joint pain, muscle pain, fever, fatigue, headaches and kidney problems, and that her ANA test (a primary indicator of lupus) was positive.  DUMF No. 15.[8]  The medical records do not indicate or suggest that lupus was ever discussed with Lor in any respect.  PUMF No. 41.

On January 5, 2005, Bagge sent Lor's Clinic records that pre-dated her application to PBI's Underwriting Department, where the records were reviewed by underwriter Lisa Gardner ("Gardner").  See PUMF No. 34; DRPUMF No. 34.[9]  Although Lor continued to receive medical care from the Clinic up through the date of her death, Bagge did not provide those records to Underwriting for consideration.  PUMF No. 35.  The records reviewed by Gardner included Lor's chart, and under the "diagnosis" section, lupus is not identified; however, again, lupus was identified under the "assessments" section of the chart.  See PUMF No. 37; DRPUMF No. 37. Gardner reviewed the records of Lor's medical treatment that pre-dated Lor's application and

---

[7]PBI received all of Lor's medical records, for the period of March 1, 2002, through April 22, 2004, from the Clinic.  PUMF No. 26.  PBI's response further indicates that medical records made after April 22, 2004, were also received.  See DRPUMF No. 26.

[8]Plaintiffs argue that this DUMF is disputed to the extent it is meant to suggest that any doctor ever diagnosed Lor with lupus or discussed the possibility of her having lupus. This, however, does not dispute the substance of the DUMF.  Whether Lor was actually diagnosed with lupus is outside the scope of this particular DUMF; DUMF No. 15 is undisputed.

[9]Gardner reviewed six pages of medical records.  See Bagge Declaration Exhibit F at pp. 88-93.  These pages included the first of two Patient Database sheets (p. 88), two pages that include the "assessment" sections (pp. 89, 93), and three pages of test results (pp. 90-92).  The lupus notations are found on pages 89 and 93, but not on the Patient Database sheet at page 88.  See Discussion infra.

1    determined that PBI would not have issued the Policy to Lor if it had known that she had been

2    diagnosed with lupus.[10]  DUMF No. 22.  Gardner most likely did not seek any input from a

3    medical director or physician before advising Bagge that the policy would not have been issued

4    due to a diagnosis of lupus.  See Wilkins Declaration at 141-42.  Bagge testified that she

5    reviewed Gardner's review and the medical records provided to Gardner with Dr. Kettelkamp,

6    PBI's medical consultant.  See Bagge Deposition at 106:14-107:12.   A notation in PBI's claim

7    file indicates that Bagge conferred with Dr. Kettelkamp on January 11, 2005.  See Wilkins

8    Declaration at 187.  The substance of the conference is not documented and neither Dr.

9    Kettelkamp nor Bagge can remember the specifics of the conference.  See Wilkins Declaration at

10   187; Bagge Deposition at 107:15-18:1; Kettelkamp Deposition at 16:24-17:4, 19:17-25.  Dr.

11   Kettelkamp testified that the diagnosis of lupus "rang a bell," but that he did not recall seeing all

12   of the medical records shown to him during the deposition.[11]  See Kettelkamp Deposition at 21:6-

13   22:21.  At his deposition, Dr. Kettelkamp testified in part:

14        Q:    In this case you don't know if back in January of 2005 the inquiry Miss Bagge
               made of you might have been just asking to describe what a medical condition
15             was or whether it actually involved reviewing medical records, do you?

16        A:    **I don't remember the specifics of our conference, as I've said before - -**

17        Q:    Okay.

18        A:    **- - but I - - just from what we usually do I would assume that she would bring
               in a front page and that they might ask this is a diagnosis.  Is this included on**
19             **the front page, whatever it was.**

20   Id. at 23:4-18.[12]

21        PBI sent a letter to Plaintiffs on January 11, 2005, requesting "a written statement

22   _____

23        [10]Specifically, Underwriting responded, "Would have declined due to Systemic Lupus Erythematosus
     (SLE) diagnosed within 1 month of app date."  Bagge Declaration Exhibit F at p. 82.

24        [11]The parties have not provided the deposition exhibits of Dr. Kettelkamp and the Court is unaware which
25   records the doctor reviewed at his deposition.

26        [12]The parties do not cite this portion of Dr. Kettelkamp's deposition.  However, Plaintiffs cite to page 21
     and PBI to page 22.  See Wilkins Declaration Exhibit G; Supplemental Laska Declaration Exhibit 4.  In reviewing
27   these pages, the Court continued to page 23 for context; page 23 is also on the same page as 21 and 22 in the "quad
     page" deposition format provided by Plaintiffs.  See Plaintiffs's Notice of Lodged Depositions Exhibit 7.

28                                                    5

regarding the following: 1. Any additional information you may have to explain why this information was not disclosed on the application. 2. Were you present at the time the application was completed?  If so, did you witness any questions being asked of Ms. Lor?  Was all information provided to the agent at that time included on the application?  3. Any additional information that you would like us to consider."[13]  DUMF No. 17.  The letter did not expressly ask whether Lor knew she had lupus or advise that whether Lor was aware of the lupus could impact PBI's decision to rescind the policy.  See PUMF Nos. 46, 51; Bagge Declaration Exhibit C at pp. 53-54.  Plaintiffs did not respond to this letter.  DUMF No. 18.[14]  Seng testified during deposition that his practice was to take letters to relatives who speak English, and who would then translate the letters for him.  DUMF No. 19.  Seng responded to PBI's other requests for information throughout the claim process through his relatives or through Her.  See DUMF No. 20; PRDUMF No. 20; Defendant's Reply to PRDUMF No. 20.  PBI also communicated with the

---

[13]The letter is addressed to all three Plaintiffs and the two preceding paragraphs read:

Through our investigation, we discovered that there were material omissions of health history on the application that Ms. Lor signed on 4/28/02 when applying for coverage.  We obtained medical records from [the Clinic] and found medical records dated prior to the application date.  These records were sent to our Underwriting Department in order to determine that had they been available at the time the original application was received, would they have affected how the policy was issued.  It was found that they would have declined coverage due to Ms. Lor's medical history of systemic lupus erythematosus diagnosed within one month of the application date.

Based upon this information, it appears that medical question #6 was answered no when it should have answered yes.  Also, additional information should have been provided in response to question #9.  At this time we are requesting from you a written statement regarding the following . . . .

Bagge Declaration Exhibit C at p. 53; see also PUMF No. 45.

[14]Plaintiffs dispute this DUMF by stating that Seng relied on relatives and Her to communicate with PBI, Her had contact with PBI after the January 11, 2005 letter was sent as evidenced by his response to PBI's January 11 inquiry, see Wilkins Declaration at 186, and Her's responses indicate a confusion of issues.  See PRDUMF No. 18.  However, none of this evidence creates a genuine dispute.  The Court reads Plaintiffs's response to this DUMF as implying that Her responded on January 11, 2005, and that response was in actuality a response authorized or directed by Seng.  There were two separate January 11, 2005, correspondences: the first is the letter directed to Plaintiffs that explained the history of lupus and requested an explanation and information, see Bagge Declaration Exhibit C at 53-54, the second was directed to only Her and contained 8 questions regarding the circumstances of Lor's application.  See Wilkins Declaration at 186.  Her signed his responses on January 13, 2005.  Id.  There is nothing to indicate that Her's response to the January 11, 2005, inquiry directed at him only was in any way intended to be a response to the January 11, 2005, letter that was sent directly to Plaintiffs.  To the extent that this accurately reflects Plaintiffs opposition, Plaintiffs's argument is disingenuous; DUMF No. 18 is not disputed.

6

1   insurance agent, Her, who confirmed that Lor had not provided him with any information about

2   her health other than what was disclosed on the application.  DUMF No. 21.[15]

3        Bagge then discussed the matter with her supervisor, Mary Landuis ("Landuis"), and the

4   decision was made to rescind the policy.  See PUMF No. 42; DRPUMF No. 42.  The nature,

5   topic, and result of the conversation between Landuis and Bagge were not documented.  See

6   PUMF No. 43; DRPUMF No. 43.  Landuis's decision to agree with rescission was based solely

7   on her discussion with Bagge and review of Gardner's memo, and did not include any

8   consultation with any medical director or treating physician.  PUMF No. 44.  Based on the

9   apparent material misrepresentations in Lor's application regarding lupus, PBI sent a letter to the

10   Plaintiffs on February 25, 2005, advising that it was denying the claim and rescinding the Policy;

11   the letter stated that "material omissions on the application were discovered."  DUMF No. 23;

12   PRDUMF No. 23; cf. PUMF No. 48.  PBI also sent each Plaintiff a check for $273.28,

13   representing one-third of the premiums that had been paid under the Policy.  DUMF No. 24.  At

14   all times during the claims process, PBI regularly corresponded with Plaintiffs and provided

15   updates on its progress.  DUMF No. 25.[16]

16        On March 22, 2005, Judy Chang called PBI on behalf of Seng to discuss the claim.  See

17   Wilkins Declaration Exhibit I at 310.  The substance of that telephone call is in dispute.  Cf.

18   PUMF No. 52 with DRPUMF No. 52.  On April 11, 2005, a complaint was made to the

19   Department of Insurance, confirming that Plaintiffs disagreed with PBI's decision.  DUMF No.

20   54.  On April 22, 2005, in response to the Department of Insurance complaint, PBI sent a letter to

21   Plaintiffs , which was copied to the Department of Insurance, and reiterated that it rescinded the

22   Policy based on Lor's medical history.  Wilkins Declaration Exhibit I at 305-306.  In neither the

23

24       [15]This communication with Her was in the form of a document with 8 questions and was also sent on
January 11, 2005.  See Wilkins Declaration at 186.  This communication is directed only to Her.  Id.  Her wrote his

25   answers on the communication/document and signed it on January 13, 2005.  Id.; see also Footnote 14 supra.

26       [16]Plaintiffs argue that the fact is disputed to the extent that it suggests that PBI undertook proper efforts to
ensure that Plaintiffs understood what was happening on the claim.  See PRDUMF No. 25.  This does not contradict

27   the fact that PBI regularly corresponded with Plaintiffs and gave them updates; whether PBI took "proper efforts" to
ensure that Plaintiffs understood is a separate issue.  DUMF No. 25 is not disputed.

28                                   7

January 11, 2005, the February 25, 2005, or the April 22, 2005, letters did PBI indicate or suggest that its decision was based on a review of the medical records by a doctor or medical director. PUMF No. 56.  PBI closed its file and did so without seeking input from the treating physicians or discussing the matter with Seng with the use of an interpreter.  PUMF No. 59.

Additionally, Bagge assumed that Lor was aware of the diagnosis because the medical records did not indicate a lack of knowledge, and Landuis stated that whether Lor knew of any lupus diagnosis was not really considered in the claims process.  See Bagge Deposition at 79:5-10; Landuis Deposition at 71:3-8.  Bagge also testified that, in her training and experience, she had not been taught or told that before a policy may be rescinded based on a misrepresentation, the applicant must be aware of the inaccuracy of the misrepresentation.  See Bagge Deposition at 82:11-18, 116:8-15.  Bagge also testified in part:

> **Q:    And that [i.e. determining whether a misrepresentation has occurred] includes determining whether the policyholder knew that a misrepresentation occurred; right?**
>
> A:    I don't believe so.
>
> ........[17]
>
> **Q:    Does it matter whether the policyholder knew if it was accurate or not?**
>
> A:    I think you're speaking to intent, and I do not believe that is required.

Bagge Deposition at 73:12-16, 74:17-21.

Bagge also testified that Lor had filled out an application in which Lor attested that she had not been diagnosed with lupus.  See Bagge Deposition at 114:18-115:14.

Similarly, Landuis also testified in part:

> **Q:    Based on the way that [PBI] handles these kinds of claims does it require before it makes a decision to rescind the policy to determine whether the policyholder knew at the time the application was filled out what the true facts were?**

---

[17]However, Bagge did respond "no" to the question, "Is it your understanding based on your training and experience that if incorrect information was on the application and the underwriting department says had we known of the true information we would not have issued the policy, that that's all you have to have to make the determination that the policy can be rescinded?"  Bagge Deposition at 73:18-74:1.

A:     No.

**Q:     Because [PBI] is of the view that if the fact is not true, that's grounds for rescission regardless of whether the policyholder knew it or not, correct?**

A:     Absolutely not.

Landuis Deposition at 70:15-71:2.

During discovery, the parties deposed Dr. Phillips and Dr. Dao.  DUMF No. 26.  Both doctors testified that Lor exhibited symptoms of lupus.  DUMF No. 27.  On August 25, 2006, Dr. Phillips testified that he thought that Lor might have had lupus.  DUMF No. 28; Lodged Phillips Deposition.  Dr. Phillips and Dr. Dao testified that they did not diagnose Lor with lupus or tell her that she had lupus.  DUMF No. 29; see also PUMF Nos. 3-5 (based on testimony of Drs. Dao and Phillips, no physician at Kings Winery Medical Clinic diagnosed, determined, or treated Lor for lupus).  PBI deposed Plaintiffs on December 14-15, 2006, and those depositions did not reveal any evidence that Lor had been told that she had lupus.  DUMF No. 30.  On January 19, 2007, PBI sent each of the Plaintiffs (through their counsel) a check for one-third of the Policy benefits plus interest calculated from the date of Lor's death until the date of the letter.  DUMF No. 31.  The letter states: "Acceptance of these payments and cashing of the enclosed checks sent to you pursuant to the terms of this letter are without prejudice to Plaintiffs's right to continue with this lawsuit and pursue their claims for extra contractual damages, or to [PBI]'s ability to assert any defenses or arguments in mitigation."  DUMF No. 32.

At all times during the handling of the claim, PBI knew that it was required to: (1) treat Plaintiffs (as beneficiaries) fairly; (2) treat Plaintiffs's interests at least equal to its own interests; and (3) provide reasonable assistance to ensure that Plaintiffs received all benefits due; (4) accurately document all material events that occurred during the course of its handling of the claim.  See PUMF Nos. 16-18, 23.  Also, at all times during its handling of the claim, PBI knew that: (1) if Plaintiffs needed special assistance because of any language issues, PBI could make arrangements to have a representative conduct a face to face meeting with Plaintiffs to make sure they understood PBI's position and to respond; (2) before it could deny coverage or rescind the

policy, it was required to conduct a full, complete, and objective investigation which included searching for facts that would support Plaintiffs's claim for benefits; (3) its investigation had to be as thorough as possible; (4) it would be improper to disregard facts or information that would support Plaintiffs's claim; (5) if it denied or rescinded the Policy, PBI's decision had to be confirmed in writing, setting forth the factual basis, including specific reference to any and all Policy provisions upon which it was based; (6) its obligation of fair dealing continued, even after litigation may have been commenced with Plaintiffs.  See PUMF Nos. 19-22, 24-25. Additionally, Landuis testified that she believed the claim was handled in the manner that PBI wanted, with the exception of an omitted address in the denial letter, and that if she had it to do over again, she would have handled the claim in the same way.  See Landuis Deposition at 18:4-24; see also Bagge Deposition at 147:19-148:14.


## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

1   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

2   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

3   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

4   file.'"  <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and

5   upon motion, against a party who fails to make a showing sufficient to establish the existence of

6   an element essential to that party's case, and on which that party will bear the burden of proof at

7   trial.  <u>Id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the

8   nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a

9   circumstance, summary judgment should be granted, "so long as whatever is before the district

10  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

11  satisfied."  <u>Id.</u> at 323.

12      If a moving party fails to carry its burden of production, then "the non-moving party has

13  no obligation to produce anything, even if the non-moving party would have the ultimate burden

14  of persuasion."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Companies</u>, 210 F.3d 1099, 1102-03 (9th

15  Cir. 2000).  If the moving party meets it initial burden, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact actually exists.  <u>See Matsushita Elec.</u>

17  <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>Nissan Fire & Marine Ins.</u>, 210 F.3d

18  at 1103; <u>Nolan v. Cleland</u>, 686 F.2d 806, 812 (9th Cir. 1982); <u>Ruffin v. County of Los Angeles</u>,

19  607 F.2d 1276, 1280 (9th Cir. 1979).  A fact is "material" if it might affect the outcome of the

20  suit under the governing law.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986);

21  <u>Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn</u>, 322 F.3d 1039, 1046 (9th Cir.

22  2002).  A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

23  could return a verdict for the nonmoving party.  <u>See Anderson</u>, 477 U.S. at 248-49; <u>Thrifty Oil</u>,

24  322 F.3d at 1046.

25      In attempting to establish the existence of a factual dispute, the opposing party may not

26  rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

27  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

28                                      11

1   contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>,

2   391 U.S. at 289; <u>Willis v. Pacific Maritime Ass'n</u>, 244 F.3d 675, 682 (9th Cir. 2001).  However,

3   the opposing party need not establish a material issue of fact conclusively in its favor.  It is

4   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

5   parties' differing versions of the truth at trial."  <u>First Nat'l Bank</u>, 391 U.S. at 290; <u>Hopper v. City</u>

6   <u>of Pasco</u>, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to

7   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

8   trial.'"  <u>Matsushita</u>, 475 U.S. at 587; <u>Mende v. Dun & Bradstreet, Inc.</u>, 670 F.2d 129, 132 (9th

9   Cir. 1982).

10          In resolving a summary judgment motion, the court examines the pleadings, depositions,

11  answers to interrogatories, and admissions on file, together with the affidavits, if any.  <u>See</u> Rule

12  56(c); <u>Fortyune</u>, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances

13  to consider materials that are not properly brought to its attention, but the court is not required to

14  examine the entire file for evidence establishing a genuine issue of material fact where the

15  evidence is not set forth in the opposing papers with adequate references.  <u>See</u> <u>Southern Cal. Gas</u>

16  <u>Co. v. City of Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified</u>

17  <u>Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be

18  believed, and all reasonable inferences that may be drawn from the facts placed before the court

19  must be drawn in favor of the opposing party.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255; <u>Matsushita</u>, 475

20  U.S. at 587; <u>Stegall v. Citadel Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless,

21  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

22  factual predicate from which the inference may be drawn.  <u>See</u> <u>Mayweathers v. Terhune</u>, 328

23  F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); <u>UMG Recordings, Inc. v. Sinnott</u>, 300 F.Supp.2d

24  993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply

25  because a litigant claims that one exist or promises to produce admissible evidence at trial."  <u>Del</u>

26  <u>Carmen Guadalupe v. Agosto</u>, 299 F.3d 15, 23 (1st Cir. 2002); <u>see also</u> <u>Bryant v. Adventist</u>

27  <u>Health System/West</u>, 289 F.3d 1162, 1167 (9th Cir. 2002).

28                                               12

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

## I.     BAD FAITH CLAIM

### *Defendant's Argument*

PBI argues that summary judgment is appropriate because it acted reasonably with respect to Plaintiffs's claim. The medical records contained two entries in the assessment section for lupus, the second entry occurring within one month of the application. Further, the medical records reflect symptoms that are consistent with lupus. Dr. Kettelkamp, the medical consultant, confirmed that the medical records reflected a diagnosis of lupus. The underwriting department confirmed that it would not have issued the policy if it had known of the lupus diagnosis. With this information, Bagge sent a letter to Plaintiffs describing the issue and asked for information explaining why Lor did not disclose the lupus diagnosis. If Plaintiffs knew nothing of a lupus diagnosis, they could have easily communicated that to PBI, but instead they chose not to respond to the letter. Bagge also sent a letter to Her, who confirmed that he recorded all medical information that Lor disclosed to him. Only after obtaining medical records, having the records reviewed by a consultant and the underwriting department, contacting and requesting information from Plaintiffs, and contacting the sales agent did PBI rescind the policy. In the course of discovery, the doctors who made the entries of lupus explained that no diagnosis was actually made, and PBI paid the claim. Although PBI's conduct may have been arguably incorrect, given

13

1   the two unambiguous written assessments of lupus, an apparent material misrepresentation, and

2   no contrary evidence despite an investigation, at the very least there was a genuine dispute

3   between PBI and Plaintiffs based on an apparent material misrepresentation regarding lupus.

4   Summary judgment is appropriate since PBI acted reasonable and there was a genuine dispute

5   between itself and Plaintiffs.

6            _Plaintiffs's Opposition_

7            Plaintiffs argue that there are genuine disputed facts regarding the adequacy of PBI's

8   investigation.  The assessments in the medical records indicate that Lor *might have* lupus, there is

9   no actual *diagnosis* of lupus.  An assessment is not the same as a diagnosis.  The medical records

10  include patient charts wherein Lor's diagnoses were specifically identified and lupus was never

11  identified in these charts.  Moreover, PBI did not consider the entire two years of medical records

12  that it obtained from the Clinic, even though a review of the two years worth of records after

13  April 2002 would have surely made reference to lupus if that had in fact been diagnosed.

14  However, after April 2002, there is no mention of lupus in the Clinic records.  Consideration of

15  these additional records would have likely prevented PBI from making an incorrect interpretation

16  of the records.  Similarly, PBI never contacted Drs. Dao or Phillips.  If PBI had done so, then

17  Dao and Phillips would have explained that PBI's interpretation of the records was incorrect and

18  that Lor was never diagnosed with lupus.  Further, the adequacy of the investigation is

19  questionable since it did not follow California case law when it rescinded the policy.  That is,

20  PBI never established that Lor had knowledge of any lupus diagnosis.  As demonstrated by

21  DUMF Nos. 8 and 9, PBI has a policy and practice of investigating for, and rescinding policies

22  on the basis of, only misinformation without regard to applicant knowledge.  This policy is

23  reflected by: (1)  the January 11, 2005, letter was not designed to seek input regarding Lor's

24  knowledge; (2) Bagge and Landuis both made it clear that no investigation was pursued to

25  determine if Lor had knowledge of an alleged lupus diagnosis; (3) PBI never sent a letter to

26  Plaintiffs which indicated that, if Lor did not know that she had lupus, that could affect the

27  decision to rescind; (4) PBI never arranged for the services of an interpreter or a face to face

28                                                14

meeting, even though they were aware that Seng did not speak English.

Bad faith is also reflected by the many instances where PBI failed to follow the California insurance code and the regulations promulgated thereunder.  The evidence indicates that PBI violated California Insurance Code §§ 790.03(h)(1), (3), (5) and (6) and 10 California Code of Regulation §§ 2695.5(e)(2), 2695.6(b), 2695.7(b)(1) and (3), 2695.7(d), and 2695.7(f).

Also, the "genuine dispute" doctrine does not apply.  PBI engaged in a biased and insufficient investigation when it failed to contact Dao and Phillips, ignored other portions of the medical record, did not consider whether Lor was aware of a lupus diagnosis, and refused to provide assistance to Plaintiffs.  By stating that Lor had been diagnosed with lupus in its letters to Plaintiffs, PBI misrepresented the nature of the investigatory proceedings and may have lied to an unsophisticated claimant.

Finally, a jury could conclude that PBI's claim that Dr. Kettelkamp reviewed the medical records and confirmed a diagnosis of lupus was false and a fraudulent tactic.   There are substantial material questions concerning Dr. Kettelkamp: (1) there is no documentation that he reviewed medical records and determined that Lor was diagnosed with lupus; (2) neither Bagge nor Kettelkamp have any recollection of the substance of the purported consultation; (3) nowhere in PBI's letter to Plaintiffs did it state that Lor's records had been reviewed by a retained medical examiner; (4) Bagge's supervisor, Landuis, established that the decision to rescind was based on the underwriter's review and no mention is made of Dr. Kettelkamp; (5) PBI did not identify Dr. Kettelkamp as part of its Rule 26 disclosures; and (6) Dr. Kettelkamp was purportedly consulted on January 11 even though underwriting presented its conclusion on January 6, 2005.  Under such circumstances, there are questions of fact whether Dr. Kettelkamp ever reviewed Lor's medical records and made any determinations regarding the same.

### _Legal Standard_

A "bad faith" claim against an insurer is based on a breach of the implied covenant of good faith and fair dealing, which exists to assure the insurer makes prompt payment of claims to the insured.  Buxbaum v. Aetna Life & Casualty Co., 103 Cal.App.4th 434, 442 (2002).  All

insurance contracts include the implied covenant of good faith and fair dealing.  See Century Surety Co. v. Polisso, 139 Cal.App.4th 922, 948 (2006); Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal.App.4th 847, 879 (2000).  Where an insurer engages in unreasonable conduct in connection with an insured's insurance claim, the insurer is said to have tortiously breached the implied covenant.  See Polisso, 139 Cal.App.4th at 948 (citing Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d 809, 818-19 (1979)).  To establish a bad faith claim, the insured must show that:  (1) benefits due under the policy were withheld; and (2) the reason for withholding the benefits was unreasonable or without proper cause.  See Neal v. Farmers Ins. Exchange, 21 Cal.3d 910, 920 (1978); Polisso, 139 Cal.App.4th at 949.

> [A] breach of the implied covenant of good faith and fair dealing involves something more than a breach of the contract or mistaken judgment.  There must be proof the insurer failed or refused to discharge its contractual duties not because of an honest mistake, bad judgment, or negligence, but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

Polisso, 139 Cal.App.4th at 948; Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal.App.4th 335, 345-46 (2001).   Stated differently, the "erroneous denial of a claim does not alone support tort liability; instead, tort liability requires that the insurer be found to have withheld benefits unreasonably."  Tomaselli v. Transamerica Ins. Co., 25 Cal.App.4th 1269, 1280 (1994).  The reasonableness of the insurer's decisions and actions "must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors."  CalFarm Ins. Co. v. Krusiewicz, 131 Cal.App.4th 273, 286 (2005); see Polisso, 139 Cal.App.4th at 949.  An insurer must give at least as much consideration to the interests of its insured as it does to its own.  See Egan, 24 Cal.3d at 818-819; Chateau Chamberay, 90 Cal.App.4th at 347.  Nevertheless, an "insurer is not a fiduciary, and owes no obligation to consider the interests of its insured above its own."  Morris v. Paul Revere Life Insurance Co., 109 Cal.App.4th 966, 973 (2003).

Conduct such as "delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and

16

numerous other tactics may breach the implied covenant . . . ." McMillin Scripps North

Partnership v. Royal Ins. Co., 19 Cal.App.4th 1215, 1222 (1993).  "An insurance company may

not ignore evidence which supports coverage.  If it does so, it acts unreasonably towards its

insured and breaches the covenant of good faith and fair dealing." Jordan v. Allstate Ins. Co.,

148 Cal.App.4th 1062, 1074 (2007); Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th

1617, 1624 (1996).  "[T]he covenant of good faith and fair dealing implied in all insurance

agreements entails a duty to investigate properly submitted claims . . . ." Shade Foods, 78

Cal.App.4th at 879-80; KPFF, Inc. v. California Union Ins. Co., 56 Cal.App.4th 963, 973 (1997).

 "[A]n insurer cannot reasonably and in good faith deny payments to its insured without fully

investigating the grounds for its denial." Egan, 24 Cal.3d at  819; Mariscal., 42 Cal.App.4th at

1624.  In fact, "[a]mong the most critical factors bearing on the insurer's good faith is the

adequacy of its investigation of the claim." Shade Foods, 78 Cal.App.4th at 879-80.  "An

unreasonable failure to investigate amounting to such unfair dealing may be found when an

insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and

damages." Shade Foods, 78 Cal.App.4th at 880; see Jordan, 148 Cal.App.4th at 1074.   Further,

violations of the insurance code and regulations of the California insurance commission may also

be sufficient to show a breach of the duty of good faith and fair dealing.  See Jordan, 148

Cal.App.4th at 1078; Rattan v. United Servs. Auto. Ass'n, 84 Cal.App.4th 715, 724 (2000).

Additionally, it has been held that, where no valid ground for rescission exists, the threat or

attempt to seek rescission may itself constitute a breach of the covenant of good faith and fair

dealing.  Atmel Corp. v. St. Paul Fire & Marine, 426 F.Supp.2d 1039, 1046 (N.D. Cal. 2005);

Imperial Cas. & Indem. v. Sogomonian, 198 Cal.App.3d 169, 185 n.16 (1988).  Generally, an

insurer may rescind a policy where the insured makes a material misrepresentation and the

insured had present knowledge of the facts sought by the insurer.[18]  See Thompson v. Occidental

---

[18]An intent to deceive need not be shown.  See Cal. Ins. Code § 332; Thompson, 9 Cal.3d at 916.
Nevertheless, "if the applicant . . . had no present knowledge of the facts sought, or failed to appreciate the
significance of information related to him, his incorrect or incomplete responses would not constitute grounds for
rescission." Thompson, 9 Cal.3d at 916.

1    Life Ins. Co., 9 Cal.3d 904, 916 (1973).  Also, although an insurer's "willingness to reconsider its

2    denial of coverage and to continue into an investigation into a claim . . . weighs in favor of good

3    faith . . . the insurer's early closure of an investigation and unwillingness to reconsider a denial

4    when presented with evidence of factual errors will fortify a finding of bad faith."  Shade Foods,

5    78 Cal.App.4th at 880.

6         However, while withholding benefits due under a policy may constitute a breach of

7    contract, liability in tort arises only if the conduct was unreasonable, and the withholding of

8    benefits due under the policy is not unreasonable if there is a genuine dispute between the insurer

9    and the insured as to coverage or the amount of payment due.  See Jordon, 148 Cal.App.4th at

10   1072; Rappaport-Scott v. Interinsurance Exchange of the Automobile Club, 146 Cal.App.4th

11   831, 837 (2007); CalFarm, 131 Cal.App.4th at 286-87; Chateau Chamberay, 90 Cal.App.4th at

12   349.  The "genuine dispute" doctrine holds "that an insurer does not act in bad faith when it

13   mistakenly withholds policy benefits if the mistake is reasonable or is based on a legitimate

14   dispute as to the insurer's liability."  Polisso, 139 Cal.App.4th at 948.  "The 'genuine dispute'

15   doctrine may be applied where the insurer denies a claim based on the opinions of experts."

16   Chateau Chamberay, 90 Cal.App.4th at 347; Fraley v. Allstate Ins. Co., 81 Cal.App.4th 1282,

17   1292 (2000).  The "genuine dispute" defense may be inapplicable if the insurer engaged in a

18   biased investigation.  Chateau Chamberay, 90 Cal.App.4th at 785-86.  A biased investigation

19   may be shown where: (1) the insurer was guilty of misrepresenting the nature of the investigatory

20   proceedings, e.g. Tomaselli, 25 Cal.App.4th at 1281; (2) the insurer's employees lie during

21   deposition or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's

22   experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation.

23   Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001); Chateau Chamberay, 90

24   Cal.App.4th at 348-49.

25         Nevertheless, "the ultimate test of bad faith liability in the first party cases is whether the

26   refusal to pay policy benefits was unreasonable," and "as long as the insurer's coverage decision

27   was reasonable, it will have no liability for breach of the covenant of good faith and fair dealing."

28                                                  18

1  <u>Morris</u>, 109 Cal.App.4th at 973, 977; <u>see also</u> <u>Chateau Chamberay</u>, 90 Cal.App.4th at 347.  "The

2  reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact."

3  <u>Hangarter</u>, 373 F.3d at 1010; <u>Chateau Chamberay</u>, 90 Cal.App.4th at 346.  An insurer is not

4  entitled to a judgment as a matter of law where, viewing the facts in the light most favorably to

5  the insured, a jury could conclude that the insurer acted unreasonably.  <u>See</u> <u>Amadeo v. Principal</u>

6  <u>Mut. Life Ins. Co.</u>, 290 F.3d 1152, 1161 (9th Cir. 2002); <u>Hubka v. Paul Revere Life Ins. Co.</u>, 215

7  F.Supp.2d 1089, 1092 (S.D. Cal. 2002).

8      *Discussion*

9      Viewing the evidence in the light most favorable to Plaintiffs, there are disputed issues of

10  material facts that prevent summary judgment on this claim.  A critical aspect of this case is the

11  medical records and PBI argues that those records unambiguously reflect a diagnosis of lupus.

12  The Court cannot agree.

13      There is no dispute that lupus is written on two pages of the medical records, once in

14  early March 2002 and once in early April 2002.  <u>See</u> Wilkins Declaration at 300, 304.   The lupus

15  notations appear next to the "assessment" section of the records.  <u>See</u> <u>id.</u>  However, the medical

16  records also contain two pages that are entitled "Patient Database."  <u>See</u> <u>id.</u> at 203-204; <u>see also</u>

17  <u>id.</u> at 299.  The Patient Databases each list the patient, medications that have been prescribed,[19]

18  collectively cover the time frame of March 2002 to April 2004, and have a section entitled

19  "Diagnosis."  <u>Id.</u>  The diagnosis boxes in the first Patient Database (which covers the time frame

20  of March 2002 to March 2003) appears to contain a number of symptoms, including "ANA +

21  1:320."[20]  <u>Id.</u> at 203, 299.  The second Patient Database (which covers the time frame of April

22  2003 to April 2004) lists only "LBP" and a condition that may be "tendonitis."  <u>Id.</u> at 204.

23  Neither "lupus" nor "SLE" are listed in the diagnosis boxes of the Patient Databases.  <u>Id.</u>  Bagge

24  had both Patient Databases available to her, but Gardner/Underwriting reviewed only the first

25  _____

26      [19]There are approximately 20 entries under the "medications" section.  <u>See</u> Wilkins Declaration at 203-204.

27      [20]The records are mostly handwritten and difficult to discern; discussion of the medical records is based on the Court's best interpretation.

28                                          19

Patient Database.  See Wilkins Declaration Exhibit I; Bagge Declaration Exhibit F.  That lupus appears under the assessment section but not in the diagnosis box is troubling.  From a lay perspective, the Court can see that "assessment" and "diagnosis" could reasonably be used interchangeably.  Cf. Gardner Deposition at 85:19-86:10 (in part, "Through reviewing medical records for the past 18 years, multiple hundreds and hundreds of cases doctors use impression, assessment, diagnosis interchangeably.").  However, the Court can also see "assessment" as reasonably referring to a "sense" or "impression" and "diagnosis" as reasonably referring to an actual, concrete determination.  Cf. Dao Deposition at 48:20-49:17 (in part, "Assessment is impression only.  And diagnosis, it's the diagnosis.").  The Patient Database sheet contains a lengthy list of medications, has multiple blank boxes to be filled in under the "Diagnosis" section, and gives the impression of a document that attempts to be exhaustive.  See Wilkins Declaration at 203-204.  That lupus is not included in the diagnosis boxes of the Patient Database sheets raises significant questions whether lupus was actually "diagnosed."

Further, from the records provided and from responses to PUMF's, it appears that the term "lupus" is written one other time, on October 15, 2002, in the medical records.  See DRPUMF No. 36.  The notation is by the "assessment" section and reads, "R/O lupus effect."  Bagge Declaration Exhibit D at p. 72.  In response to PUMF No. 36, PBI states that the notation means "rule out lupus effect."  DRPUMF No. 36.  If Dr. Phillips wished to "rule out" lupus, this suggests that he was uncertain whether Lor actually had lupus or whether lupus had actually been diagnosed.  For purposes of initially investigating whether a material misrepresentation occurred, focusing on the records that pre-dated Lor's April 2002 policy application is reasonable.  However, once the lupus notations were discovered under the "assessment" section, but then were not listed under the "diagnosis" boxes of the Patient Database sheets, an examination of the remaining records would not have been unreasonable in order to confirm a lupus diagnosis.  Since "lupus" reappeared in October 2002 in the context of "ruling out" the condition, the post-April 2002 records would have suggested that no diagnosis was actually made.[21]

---

[21]Again, neither lupus nor SLE appears in the second Patient Database sheet.

1     Further, it appears that the physician who wrote "lupus" and "SLE" in the assessment

2   section was Dr. Phillips.  There is no dispute that Dr. Phillips left the Clinic in 2003.  However,

3   Dr. Phillips was included in PBI's Rule 26 disclosures and there is no indication that he would

4   have been difficult to track down.  Plaintiffs's argument for purposes of this motion is well taken

5   that, had PBI telephoned Dr. Phillips, there is no reason to think that he would have told PBI

6   anything different from what he said at his deposition: he did not formally diagnose lupus and did

7   not tell Lor that she had lupus.  See DUMF No. 29.  Such information from the author of the

8   "lupus" and "SLE" notation would have shown that Lor had no knowledge and made no knowing

9   misrepresentations.  Cf. Mariscal, 42 Cal.App.4th at 1624-1625 (noting that reasonable

10  investigation required insurer to contact treating physician in part to help "clarify the meaning of

11  his words").

12    Additionally, Bagge's deposition excerpts suggest that she was unaware of the

13  requirement that an applicant's knowledge of falsity must be established in order to rescind a

14  policy on the basis of a misrepresentation.  The deposition further suggests that she simply

15  assumed that Lor was aware of a lupus diagnosis.  However, the pre-insurance application

16  medical records do not appear to have a notation that lupus was actually discussed with Lor or

17  that Dr. Phillips actually spoke with Lor about lupus.  Similarly, it is unclear whether Landuis

18  was also unaware of the knowledge of falsity requirement to rescind, but her deposition

19  testimony indicates that Lor's knowledge of the lupus diagnosis was not considered.

20    Also, it is true that Plaintiffs did not respond to the January 11, 2005, letter, and, despite

21  Plaintiffs's argument/interpretation, the letter provided the opportunity for Plaintiffs to explain

22  that they and Lor had no knowledge of a lupus diagnosis.  However, Plaintiffs have submitted

23  two declarations, one from the insurance agent Her and one from Judy Chang, who helped Seng

24  translate.[22]  Chang declared that, after PBI denied the claim, Chang spoke on the telephone to PBI

25  _____

26      [22]Plaintiffs often point out that Seng does not speak or read English.  However, by the time of the January
    11, 2005, letter, Plaintiffs Mai Yang and Yia Yang were adults and, since their depositions were taken in English

27  without the need for a translator, they obviously understood English.  See Bagge Declaration Exhibit B at 39-40;
    Supplemental Laska Declaration at ¶ 7.  There is no explanation proffered why Mai and Yia did not respond or

28  translate or speak for themselves or Seng.

21

1  and "explained that [Seng] did not believe Chue Lor had ever been diagnosed with any serious

2  illness and believed the information included on the application was accurate."  Chang

3  Declaration at ¶ 3.  Similarly, Her declared that he provided assistance in communicating with

4  PBI, which included making telephone calls and writing letters for Seng.  See Her Declaration at

5  ¶¶ 4-5.  During conversations with PBI (although the approximate date is not identified), Her

6  "advised [PBI] that no family members were aware of any serious or significant illness by Chue

7  Lor."  Id. at ¶ 7.  Chang's representations were likely received on March 22, 2005, see Chang

8  Declaration at ¶ 3; PUMF No. 52; DRPUMF No. 52, and it is unclear when Her provided his

9  information.  PBI does not sufficiently address these declarations.  Given the ambiguous state of

10  the medical records, if those who spoke for Seng informed PBI that, to the family's knowledge

11  no serious illnesses were ever diagnosed, this suggests that Lor may not have had knowledge of

12  any purported lupus diagnosis.  Viewed in the light most favorable to Plaintiffs as the non-

13  moving party, that PBI did not consider this evidence or reevaluate the situation weighs in favor

14  of bad faith.[23]  Cf. Shade Foods, 78 Cal.App.4th at 880.

15         With respect to Dr. Kettelkamp, the evidence indicates that Dr. Kettelkamp was

16  consulted.  The nature of the consultation and Dr. Kettelkamp's actual conclusions, however, are

17  not clear.  Bagge had no recollection of the specifics of the conversation, said that the

18  documentation from underwriting (including the records sent to underwriting) was discussed

19  with Dr. Kettelkamp, and did not document the substance of their conversation.  Dr. Kettelkamp

20  himself did not make any notations and could not remember the substance of the consultation.

21  His testimony is further unclear if he remembered reviewing any of Lor's medical records in

22  January 2005.  See Kettelkamp Deposition at 21:6-22:21.  Dr. Kettelkamp did suggest that the

23  usual consult involved comparing a diagnosis with "questions on the front page," that is, whether

24  a diagnosis was "included in the questions page."  Id. at 23:4-18.  It is not clear, but "questions

25  on the front page" may refer to the questions on PBI's application forms, although those

26

27         [23]There is no dispute that Lor and Seng told Her that Lor had not been treated for any serious injuries or
    medical problems.  See PUMF No. 10.

28
                                          22

questions are on "page 2." Cf. Bagge Declaration Exhibit F at p. 84. The only documentation that firmly states that a diagnosis of lupus was made was the conclusion by Gardner/Underwriting. Viewing the evidence in the light most favorable to Plaintiffs as the non-moving parties, Dr. Kettelkamp's description of a typical consult does not suggest an in-depth review of the records and the evidence submitted does not establish that Dr. Kettelkamp confirmed that a diagnosis of lupus was made. Cf. DUMF No. 16. The jury will have to determine the nature and reasonableness of Dr. Kettelkamp's review of the medical records and/or the nature of the review requested and received by Bagge.

Finally, there may be violations of the California Insurance Code and the administrative regulations implementing the Code, although the briefing and argumentation is rather conclusory.[24] The February 25, 2005, denial letter did not advise Plaintiffs of their right to have the denial decision reviewed by the insurance commission, which is contrary to 10 C.C.R. § 2695.7(b)(3).[25] As discussed above, the thoroughness and sufficiency of the investigation is in question, which implicates 10 C.C.R. § 2695.7(d). The state of the evidence as submitted suggests that Bagge and Landuis were not familiar with the requirement that an applicant must have knowledge of the falsity of a misrepresentation, which may implicate Insurance Code § 790.03(h)(3). PBI waited to complete the depositions of Plaintiffs in December 2005 and then paid the $50,000 plus interest in January 2006, even though Dr. Phillips (the author of the lupus notations) explained in August 2005 that no lupus diagnosis was made, which might implicate Insurance Code § 790.03(h)(5). It is not necessary at this time to discuss each of the eleven code and administrative sections listed by Plaintiffs,[26] but violations of code and administrative provisions may evidence bad faith. See Jordan, 148 Cal.App.4th at 1078.

Whether an insurance company has breached its duty of good faith and fair dealing, i.e. is

---

[24]Neither party has submitted authority that actually interprets the sections identified by Plaintiffs.

[25]PBI argues that February 2005 denial letter ends mid-sentence, which indicates a word-processing error.

[26]Given the state of the briefing, the Court is not holding that any code or administrative provision was or was not violated. However, it appears that Plaintiffs may be overreaching by arguing that 10 C.C.R. §§ 2695.6(b) and 2695.7(f) were violated.

guilty of bad faith, is generally a question of fact for the jury.  Chateau Chamberay, 90 Cal.App.4th at 346.  Summary judgment is appropriate for such claims only if the evidence could not support a finding, by a preponderance of the evidence, that PBI breached its duty.  Amadeo, 290 F.3d at 1161.  Viewed in the light most favorable to Plaintiffs as the non-moving party, the evidence suggests ambiguous medical records, an inadequate investigation and disregard of contrary evidence, and violations of the Insurance Code and regulatory provisions.  Cf. Jordan, 148 Cal.App.4th at 1074, 1078; Shade Foods, 78 Cal.App.4th at 879-880; Mariscal, 42 Cal.App.4th at 1624-1625.  An inadequate investigation may defeat the genuine dispute defense.[27]  See Chateau Chamberay, 90 Cal.App.4th at 348-49.  Given the parameters of summary judgment, the Court believes that the issue is close and that a jury could find for either Plaintiffs or PBI.  Accordingly, there are genuine issues of disputed material fact.  PBI's motion for summary judgment on Plaintiffs's bad faith claim will be denied.

## II.      PLAINTIFFS'S PUNITIVE DAMAGES CLAIM

### *Defendant's Argument*

A finding of bad faith does not automatically lead to punitive damages.  Punitive damages are only appropriate if, by clear and convincing evidence, the defendant acted with malice, fraud, or oppression.  The evidence shows PBI acted reasonable at all times.  There is no evidence that PBI acted with malice, fraud or oppression.  The evidence shows that PBI communicated with Plaintiffs about their claim and gave them numerous opportunities to provide more information

---

[27]Plaintiffs argue that all five exceptions to the genuine dispute defense identified in *Chateau Chamberay* apply in this case.  Given the resolution of this motion, it is not necessary to address each exception.  However, the Court will say that it does not see that PBI misrepresented to Plaintiffs the nature of the investigation.  *Tomaselli* is the case that forms the basis of this exception, see Chateau Chamberay, 90 Cal.App.4th at 348, and this case does not appear to be *Tomaselli*.  In *Tomaselli*, the Plaintiffs were misled by statements that the "examination under oath" was a simple procedure to help settle the claim, the plaintiffs were dissuaded from having an attorney, and the plaintiffs were not told that the purpose of the investigation was to search for policy violations.  Tomaselli, 25 Cal.App.4th at 1281.  Here, the January 11, 2005 letter informed Plaintiffs that PBI was verifying information, had found inaccurate responses based on the lupus "diagnosis," requested information and explanation, and told Plaintiffs that the failure to respond may force PBI to rescind the policy and return the premiums.  See Bagge Declaration Exhibit C at 53-54.  That is, the letter informs Plaintiff that the accuracy of the responses in the application are at issue and that rescission could occur.  Plaintiffs never responded.  See DUMF No. 18.  Given the evidence presented at this point, the Court does not see any misrepresentation about the investigation and does not see a similarity with *Tomaselli*.

1    both before and after rescinding the policy.  After discovery indicated that the decision may have

2    been incorrect, it paid the claim with interest.  Punitive damages fail as a matter of law.[28]

3        *Plaintiff's Opposition*

4        Plaintiffs argue that there are triable issues of fact regarding malice, oppression, and

5    fraud.  Malice may be shown through despicable conduct which demonstrates a willful and

6    conscious disregard for the rights of plaintiffs.  Given PBI's limited review and misconstruction

7    of medical records, falsely advising Plaintiffs that Lor was diagnosed with lupus, not considering

8    whether Lor had knowledge of any lupus diagnosis, and maintaining a custom and practice of not

9    considering an applicant's/claimant's knowledge of misrepresentations are sufficient for a jury

10   conclude that PBI acted with malice.  Further, a jury could conclude that PBI engaged in

11   fraudulent and deceptive practices by informing Plaintiffs that the medical records showed that

12   Lor was diagnosed with lupus, and the letters did not provide notice to Plaintiffs to challenge

13   whether a diagnosis had actually been made.  Finally, because PBI's investigation was result

14   oriented, a jury could conclude that the investigation was designed to take unfair advantage of

15   unsophisticated claimants and was thus, oppressive.

16       *Legal Standard*

17       "The availability of punitive damages is . . . compatible with recognition of insurers's

18   underlying public obligations and reflects an attempt to restore balance in the contractual

19   relationship."  Egan, 24 Cal.3d at 820; Betts v. Allstate Ins. Co., 154 Cal.App.3d 688, 710

20   (1984).  To obtain punitive damages under California law, a plaintiff must show that a defendant

21   engaged in malice, fraud, or oppression.  See Cal. Civ. Code § 3294;[29] Shade Foods, 78

22   _____

23   [28]PBI initially argued that since Plaintiff's bad faith claim fails, the request for punitive damages fails as a
     matter of law.  Since the bad faith claim does not fail as a matter of law, PBI's initial argument is unavailing.

24
     [29]California Civil Code § 3294 reads in part:
25
     (a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing
26   evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual
     damages, may recover damages for the sake of example and by way of punishing the defendant.
27   (b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the
     employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her
28   with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which

Cal.App.4th at 890-91.  "[A]n insurer's bad faith may not only breach the implied covenant of good faith and fair dealing, but also can be treated for tort purposes as a basis for exemplary damages where it occurs in a context of malice, fraud, or oppression." Betts, 154 Cal.App.3d at 708; see PPG Indus. v. Transamerica Ins. Co., 20 Cal.4th 310, 319 (1999); Jordan, 148 Cal.App.4th at 1080; Tomaselli, 25 Cal.App.4th at 1286.  In other words, "Punitive damages are recoverable . . . when the defendant breaches the implied covenant of good faith and fair dealing and is guilty of oppression, fraud, or malice." Tibbs v. Great American Ins. Co., 755 F.2d 1370, 1375 (9th Cir. 1985).  Otherwise, bad faith by itself is insufficient to support punitive damages. See Silberg v. California Life Ins. Co., 11 Cal.3d 452, 462-63 (1974); Jordan, 148 Cal.App.4th at 1080; Mock v. Michigan Millers Ins. Co., 4 Cal.App.4th 306, 328 (1994).  "To find the requisite intent for an award of punitive damages, it is necessary to search beyond the facts of unreasonable response to those adducing motive and intent," and there "must be substantial evidence of an intent to vex, injure, and annoy, a conscious disregard of the [insured's] rights, before punitive damages may be awarded." Betts, 154 Cal.App.3d at 709; see also Silberg, 11 Cal.3d at 462-63; Tomaselli, 25 Cal.App.4th at 1287-88.  The insured "must demonstrate by clear and convincing evidence that the insurer acted with malice, oppression or fraud. Jordan, 148 Cal.App.4th at 1080; Mock, 4 Cal.App.4th at 328.  The "clear and convincing" evidence standard "requires a finding of high probability . . . so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind." In re Angelia P., 28 Cal.3d 908, 919 (1981); Lackner v. North, 135 Cal.App.4th 1188, 1211 (2006); Shade Foods, 78 Cal.App.4th at 891.

the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.
(c) As used in this section, the following definitions shall apply:
(1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.
(2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.
(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

26

1

*Discussion*

2     With respect to fraud, the basis of Plaintiffs's argument is that PBI wrote in several letters

3 that Lor had been diagnosed with lupus.  "'Fraud' means an intentional misrepresentation, deceit,

4 or concealment of a material fact known to the defendant with the intention on the part of the

5 defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

6 Cal. Civ. Code § 3294((c)(3).  To rely on "fraud" to support punitive damages, Plaintiffs must

7 present evidence that indicates that PBI knew that Lor was never diagnosed with lupus but told

8 Plaintiffs that she was so diagnosed in order to deprive Plaintiffs of their benefits under the

9 Policy.  However, Plaintiffs have not presented evidence that shows PBI knew that Lor was not

10 diagnosed with lupus.  The medical records were ambiguous and lupus was written in the

11 assessment section.  PBI did not cancel the policy immediately after detecting the notation.

12 Instead, PBI requested additional information and explanation from Plaintiffs through the

13 January 11, 2005, letter.  Plaintiffs never responded.  See DUMF No. 18.  That Dr. Phillips's

14 testimony establishes that a diagnosis was not actually made does not show that PBI knew that

15 lupus had not been diagnosed.  Plaintiffs have not met their burden of producing evidence that

16 could support a finding of fraud by clear and convincing evidence.  Cf. Anderson, 477 U.S. at

17 255-56.

18     With respect to oppression, the basis of Plaintiffs's argument is that PBI engaged in a

19 result oriented investigation and a jury could conclude that it did so for the purposes of taking

20 advantage of unsophisticated claimants.  "'Oppression' means despicable conduct that subjects a

21 person to cruel and unjust hardship in conscious disregard of that person's rights."  Cal. Civ.

22 Code § 3294(c)(2).  "'Despicable conduct' is conduct which is so vile, base, contemptible,

23 miserable, wretched or loathsome that it would be looked down upon and despised by ordinary

24 decent people."  Mock, 4 Cal.App.4th at 331.  Plaintiffs have not presented sufficient evidence to

25 show oppression.  There is no suggestion that the claim form filled out by Plaintiffs was unfair or

26 unreasonable, the medical records were obtained from the Clinic and apparently required only

27 Seng's consent, see DUMF Nos. 10-11, and the requested clarification and explanation in the

28

1  January 11, 2005, letter was not onerous.  See Bagge Declaration Exhibit C.  There is no

2  indication that PBI objected or forbad its agent, Her, from translating and/or helping Plaintiffs

3  during the claims process.  Plaintiffs have not shown how PBI's conduct  subjected them to cruel

4  and undue hardship.  Plaintiffs have not met their burden of introducing evidence that could

5  support a finding of oppression by clear and convincing evidence.  Cf. Anderson, 477 U.S. at

6  255-56.

7        With respect to malice, the basis of Plaintiffs's argument is that PBI engaged in a limited

8  and unreasonable review and investigation of Plaintiffs's claims, that PBI was attempting to take

9  advantage of Plaintiffs, that PBI's conduct was grounded in established policy, and this conduct

10  shows both an intent to injure and despicable conduct.  "'Malice' means conduct which is

11  intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried

12  on by the defendant with a willful and conscious disregard of the rights or safety of others."  Cal.

13  Civ. Code § 3294(c)(1).[30]  Despite Plaintiffs's arguments, the Court sees no evidence of an intent

14  to harm Plaintiffs nor does it see evidence that PBI was trying to take advantage of

15  "unsophisticated claimants who were most likely of limited means."[31]  There is no evidence

16  concerning the consequences of the denial of benefits, nor is there evidence that PBI was aware

17  of any consequences that Plaintiffs would suffer.  PBI did not forbid its agent Her from helping

18  or translating for Seng and PBI informed Plaintiffs of the issue surrounding the lupus "diagnosis"

19  through the January 11, 2005 letter.  Further, Plaintiffs and PBI had communicated with each

21  [30]Plaintiffs cite a number of cases (Hughes v. Blue Cross of No. Cal., 215 Cal.App.3d 832 (1989), Downey

22  Savings & Loan Assn. v. Ohio Cas. Ins. Co., 189 Cal.App.3d 1072 (1987), Delgado v. Heritage Life Ins. Co., 157
Cal.App.3d 262 (1984), and Moore v. American United Life Ins. Co., 150 Cal.App.3d 610 (1984)) that pre-date the

23  1987 amendments to § 3294.  Effective January 1, 1988, "malice" and "oppression"were defined to include
"despicable conduct" and punitive damages were required to be proven by "clear and convincing evidence."  See

24  Mock, 4 Cal.App.4th at 327-28, 332.  These "pre-1987 amendment" cases remain instructive, but it must also be
recognized that the burden imposed in those cases was less stringent than what current § 3294 now requires.  Cf.

25  Mock, 4 Cal.App.4th at 331-32.

26        [31]While Seng is not proficient in English, there is no evidence concerning his education level.  Further, by

27  the time of the January 11, 2005, letter, Plaintiffs Mai Yang and Yia Yang were adults and, since their depositions
were taken in English without the need for an interpreter, they were obviously proficient in English.  See Bagge

28  Declaration Exhibit B at 39-40; Supplemental Laska Declaration at ¶ 7.  There is also no evidence as to the financial
condition of Plaintiffs.

1  other throughout the claims process.

2  However, in applying § 3294, courts have recognized that "the existence of established

3  policies or practices in claims handling which are harmful to insureds" may support the

4  imposition of punitive damages.  Mock, 4 Cal.App.4th at 329; see Hangarter, 373 F.3d at 1014

5  (punitive damages upheld where defendant had a "conscious course of conduct, firmly grounded

6  in established company policy, that disregarded the rights of insureds"); Neal, 21 Cal.3d at 923

7  (punitive damages upheld where defendant had a "conscious course of conduct, firmly grounded

8  in established company policy, designed to utilize the lamentable circumstances in which

9  [plaintiffs] found themselves. . . .").   In order to rescind a policy in California based on

10  concealment in the application process, the insurer must establish a material misrepresentation

11  that was *known* to the claimant/applicant.  Thompson, 9 Cal.3d at 916, 919; Trinh v.

12  Metropolitan Life Ins. Co., 894 F.Supp. 1368, 1372-73 (N.D. Cal. 1995); see also Cal. Ins. Code

13  §§ 330-332, 334; Judicial Council of California, Civil Jury Instructions § 2308 (Spring 2007 ed.).

14  Rescission cannot be based on information that was unknown to, or not fully understood by, the

15  applicant.  See Cal. Ins. Code § 330; Miller v. Republic National Life Ins. Co., 789 F.2d 1336,

16  1339-40 (9th Cir. 1986); Thompson, 9 Cal.3d at 916.  Life insurance may serve a savings or

17  investment function, see In re Payne, 323 B.R. 723, 728 (9th Cir. BAP 2005), but in many

18  instances "the real purpose of life insurance is to provide for the maintenance of the insured's

19  dependents."  Turner v. Metropolitan Life Ins. Co., 56 Cal.App.2d 862, 867 (1943).

20  Here, the evidence is such that more than one inference can be made.  The January 11,

21  2005, letter specifically identified what appeared to be an incorrect answer on the application

22  form regarding lupus and the letter requested information and explanation why the lupus

23  "diagnosis" was not disclosed and also any additional information that Plaintiffs may want

24  considered.  See Bagge Declaration Exhibit C at 53-54.  Landuis disagreed with the proposition

25  that falsity regardless of knowledge was irrelevant to determining whether to rescind.  See

26

27

28

29

1   Landuis Deposition at 70:23-71:2.[32]  Similarly, Bagge indicated that, in her training and

2   experience, materiality and falsity are not all that is required to rescind a policy.  See Bagge

3   Deposition at 73:18-74:1.  However, the testimony of Bagge and Landuis is not absolutely clear.

4   At other points in the deposition, the definite sense from the testimony is that knowledge by the

5   applicant of falsity is not required prior to rescission.  See Bagge Deposition at 73:12-16, 74:17-

6   21, 82:11-18, 116:8-15; Landuis Deposition at 70:15-22.  That is, both Landuis and Bagge

7   appeared to indicate that it was not necessary to determine whether an applicant had knowledge

8   of an inaccuracy before rescission could occur.  See id.  What actually needs to be shown in the

9   minds of Bagge, Landuis, and PBI is unknown.  Also, there appears to have been no effort to

10  expressly determine Lor's knowledge of the lupus "diagnosis," and the deposition testimony of

11  Landuis and Bagge indicates that Lor's knowledge of the lupus "diagnosis" was either assumed

12  or not considered in the claims process.  See Bagge Deposition at 79:5-10; Landuis Deposition at

13  71:3-8.  It is true that Plaintiffs did not respond to the January 11, 2005, letter, but considering

14  the testimony of Bagge and Landuis, it is not clear what would have happened had Plaintiffs

15  responded to the January 11, 2005, letter by stating that no one was aware of the lupus

16  "diagnosis."  In fact, Landuis and Bagge's testimony could be viewed as indicating that the

17  January 11, 2005, letter was not attempting to determine Lor's knowledge.  Finally, both Landuis

18  and Bagge indicated that the investigation of Plaintiffs's claim was in accordance with what PBI

19  wanted, and Landuis stated that the claim would have been handled in the same way if it were to

20  be done over again.  See Bagge Deposition at 147:19-148:14; Landuis Deposition at 18:4-24.

21  Presumably, this means that PBI would again not determine Lor's knowledge of the lupus

22  "diagnosis" prior to rescission.

23      Viewed in the light most favorable to the Plaintiffs, the testimony of Landuis and Bagge

24  could indicate an established policy by PBI to rescind policies based on a misrepresentation that

25  is material, but without determining the applicant's knowledge of a misrepresentation, and that

27      [32]In contrast, in the preceding question, Landuis indicated that PBI did not require that an applicant know of
28  the falsity of a representation prior to rescission.  See Landuis Deposition at 70:15-22.

1   PBI was not specifically trying to ascertain Lor's knowledge of the "diagnosis" through the

2   January 11, 2005 letter.  Such a policy and practice is contrary to California law.  Further,

3   considering that the purpose of many life insurance policies is to provide a measure of monetary

4   security for one's dependents, regularly rescinding policies without regard for what California

5   law requires may be viewed as despicable conduct that shows a reckless disregard for the rights

6   of life insurance beneficiaries.  The Court believes that this a close issue.  However, viewing the

7   testimony of Landuis and Bagge in the light most favorable to Plaintiffs, a jury could find malice

8   based on a practice of PBI of rescinding life insurance policies without determining an

9   applicant's knowledge.  The Court cannot say that there is either a presence or absence of malice

10  as a matter of law given the evidence presented; summary judgment on punitive damages will be

11  denied.

12

13                    _____   **CONCLUSION**

14        PBI moves for summary judgment on Plaintiffs's bad faith claim and request for punitive

15  damages.  Viewed in the light most favorable to the Plaintiffs as the non-moving party, the

16  evidence presented indicates an investigation that was inadequate and not thorough, a possible

17  disregarding of evidence that supported Plaintiffs's claim, and violations of statutory and

18  regulatory violations.  Although the existence of a "genuine dispute" is a defense to a bad faith

19  claim, an inadequate investigation may defeat that defense.  Viewed in this light, there is a

20  genuine issue of disputed material fact with respect to the reasonableness of PBI's conduct.

21  Therefore, summary judgment in favor of PBI as to Plaintiffs's bad faith claim is denied.

22        With respect to punitive damages, as with other points in its opposition, Plaintiffs

23  overreach by arguing that punitive damages are warranted on the basis of fraud and oppression.

24  However, viewed in the light most favorable to Plaintiffs, the evidence indicates that PBI did not

25  determine Lor's knowledge and had a policy or practice that it did not need to determine an

26  applicant's knowledge prior to rescission of a policy on the basis of misrepresentation or

27  concealment.  Viewed in this light, there is a genuine issue of disputed material  fact with respect

28

1   to malice.   Therefore, summary judgment on Plaintiffs's punitive damages claim is denied.

2

3        Accordingly, IT IS HEREBY ORDERED that Defendant's motion for summary

4   judgment is DENIED.

5

6   IT IS SO ORDERED.

7   **Dated:    May 25, 2007**              **    /s/ Anthony W. Ishii    **
                                            UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28